**LITE DePALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma, Esq.
Katrina Blumenkrants, Esq.
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 968-3845

**NEWMAN, CREED & ASSOCIATES**
Bruce E. Newman, Esq.
Kevin E. Creed, Esq.
99 North Street, Rte. 6
P.O. Box 575
Bristol, CT 06011-0575
Telephone: (860) 583-5200
Facsimile: (860) 582-0012

*Attorneys for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| Todd Sokolowski, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MENU FOODS, INC., MENU FOODS, MENU FOODS INCOME FUND, and THE IAMS COMPANY<br><br>Defendants. | Civil Action No. 1:07-CV-01709 NLH-AMD |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION PURSUANT TO FEDERAL RULE 23(d) FOR A PROTECTIVE ORDER TO SUPERVISE OR LIMIT PROCTER & GAMBLE'S COMMUNICATIONS WITH CLASS MEMBERS**

147083 v1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

I.   INTRODUCTION AND FACTUAL BACKGROUND ........................................ 2

II.  LEGAL ARGUMENT ................................................................ 6

     A.   Procter & Gamble Has Conducted Wrongful Communications
          With Named Plaintiffs and Pet Owners Known to be Represented
          By Counsel ............................................................. 6

     B.   The District Court Has Broad Authority to Regulate
          Communications With the Putative Class ................................. 9

     C.   Procter & Gamble's Contact with Potential Class Members
          Is Improper ........................................................... 10

          1.   Procter & Gamble's Communications Are Transactional,
               Not Informational ................................................ 11

          2.   Procter & Gamble's Unilateral Communications Are
               Coercive and Misleading .......................................... 13

     D.   Proposed Remedy ....................................................... 15

III. CONCLUSION ................................................................... 16

## **TABLE OF AUTHORITIES**

**Cases** **Pages**

*Collins v. Int'l Dairy Queen*,
    190 F.R.D. 629 (M.D. Ga. 1999) .................................................... 11

*Curley v. Cumberland Farms, Inc.*,
    134 F.R.D. 77 (D.N.J.1990) .......................................................... 6

*Erhardt v. Prudential Group, Inc.*,
    629 F.2d 843 (2d Cir. 1980) .......................................................... 10

*Gulf Oil v. Bernard*,
    452 U.S. 89 (1981) ....................................................................... 9, 10

*Holdren v. Gen. Motors Corp.*,
    13 F. Supp. 2d 1192 (D. Kan. 1998) ............................................. 6, 7

*In re Currency Conversion Fee Antitrust Litig.*,
    361 F. Supp. 2d 237 (S.D.N.Y. 2005) ........................................... 10, 11

*In re Envtl. Ins. Declaratory Judgment Actions*,
    252 N.J. Super. 510 (1991) ........................................................... 6, 7

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ............................................................ 15

*In re Medtronic, Inc., Implantable Defibrillator Prods. Liab. Litig.*,
    434 F. Supp. 2d 729 (D. Minn. 2006) ........................................... 9

*In re Marietta*,
    223 Kan. 11 (1977) ....................................................................... 7

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1239 (N.D. Cal. 2000) ........................................ 15

*In re School Asbestos Litig.*,
    842 F.2d 671 (3d Cir. 1988) .......................................................... 10, 14

*Jenifer v. Delaware Solid Waste Auth.*,
    1999 U.S. Dist. LEXIS 2542 (D. Del. Feb. 25, 1999) .................. 9, 10

*Kleiner v. First Nat'l Bank,*
    751 F.2d 1193 (11th Cir. 1985) ............................................. 13, 14, 15

*Massa v. Eaton Corp.,*
    109 F.R.D. 312 (W.D. Mich. 1985) ................................................. 7

*Morgan v. United Parcel Serv. of Am., Inc.,*
    1998 U.S. Dist. LEXIS 20197 (E.D. Mo. Oct. 16, 1998) ............................ 11

*On the House Syndication, Inc. v. Federal Express Corp.,*
    203 F.R.D. 452 (S.D. Cal. 2001) .................................................. 11

*Ralph Oldsmobile, Inc. v. Gen Motors Corp.,*
    2001 U.S. Dist. LEXIS 13893 (S.D.N.Y. Sept. 7, 2001) ............................ 14

*Redmond v. Moody's Investor Serv.,*
    1995 U.S. Dist. LEXIS 6277 (S.D.N.Y May 10, 1995) .............................. 11

*Weight Watchers, Inc. v. Weight Watchers Int'l, Inc.,*
    455 F.2d 770 (2d Cir. 1972) ...................................................... 14

## Rules

Fed.R.Civ.P. 23(d) ..................................................................... *passim*

## Other Authorities

5 *Newberg on Class Actions* § 15:19 (4th ed.) ........................................... 15

5 *Newberg on Class Actions* § § 15:14 (4th ed.) ..................................... 15

Plaintiff Todd Sokolowski, through his counsel, on behalf of himself and all others similarly situated, respectfully submits the issue of The Procter & Gamble Company's ("Procter & Gamble") improper communications with putative class members to the Court for resolution on an emergency basis. For the reasons set forth below, Plaintiff urges this Court to exercise its inherent authority to protect absent class members and to prohibit any further coercive and misleading communications with the absent class. Procter & Gamble is engaging in communications similar to those previously conducted by Menu Foods.[1] Just as Menu Foods' conduct warranted scrutiny by this Court, Procter & Gamble's communications are deserving of the same attention.[2]

Procter & Gamble is communicating with pet owners who are named plaintiffs and other represented pet owners *even after* learning they are represented by counsel. Also, the communications at issue are misleading because they fail to advise pet owners of existing alternatives for resolving their claims, and particularly fail to mention pending litigation concerning the very issues about which Procter & Gamble is contacting consumers. They also fail to inform pet owners that they may retain their own counsel to evaluate all of their options or any settlement offers received. These communications attempt to foreclose potential class members' opportunities to pursue claims through avenues other than direct and hasty settlements with the company, on the company's terms.

A Protective Order by this Court will ensure that these communications strike a balance between Procter & Gamble's right to communicate information to its customers, and potential class members' rights to be free of misleading and coercive communications by defendant.

---

[1] Plaintiff continues to investigate evidence that defendants other than Menu Foods and Procter & Gamble may be engaging in similar inappropriate communications and may later seek Court protection from these communications as well.

[2] *See Workman et al. v. Menu Foods et al.*, Case No. 1:07-CV-01338-NLH-AMD, Consent Order, filed on June 4, 2007 [Docket No. 31], attached, together with a copy of the docket in that matter as of June 18, 2007 as Exhibit ("Exh.") H to the Declaration of Joseph J. DePalma dated June 18, 2007 and filed concurrently herewith (the "DePalma Decl.").

147083 v1                                    1

Plaintiff acknowledges the Court's May 2, 2007 Order staying this case, but Procter & Gamble is clearly abusing the stay to its advantage in the litigation by exerting pressure on both represented and unrepresented putative class members to accept settlements and obtain releases without full and fair disclosure of all relevant legal and factual information. Plaintiff therefore requests that the stay be temporarily lifted solely for the purpose of this emergency motion. This Court's response is of a time-sensitive nature because Procter & Gamble's one-sided communications with putative class members may have lasting effects on the rights of claimants to recover for their losses, and an even broader impact on the course of this multidistrict litigation.

## I.    INTRODUCTION AND FACTUAL BACKGROUND

As the Court is aware, this case and the approximately 100 related actions now pending throughout the country involve the largest pet food recall in United States history ("Recall").[3] The Recall was initiated by Menu Foods Income Fund and its related entities (collectively "Menu Foods") on March 16, 2007.[4] The Recall quickly expanded to include more than 200 products, with Menu Foods expanding its own recall on at least five separate occasions.

The universe of potential liable parties expanded just as quickly as it became apparent that the Recall implicated other manufacturers and retailers. Menu Foods manufactures cat and dog food under many brand names, including such brands as Iams, Eukanuba and Science Diet. Iams and Eukanuba are products manufactured by Procter & Gamble. The Eukanuba Company ("Eukanuba") and The Iams Company ("Iams"), a defendant in the instant case, are subsidiaries of Procter & Gamble.[5] Collectively, Procter & Gamble refers to its pet food lines as "P&G Pet

---

[3] Several plaintiffs and defendant Menu Foods have moved for coordination or consolidation and transfer pursuant to 28 U.S.C. § 1407 before the Judicial Panel on Multidistrict Litigation (the "Panel)). No party disputes that centralization is appropriate. A number of plaintiffs have advocated the transfer of all related actions to this Court. The Panel heard the matter on May 31, 2007 in Las Vegas, Nevada.

[4] The related entities include Menu Foods, Inc., Menu Foods Midwest Corp., Menu Foods South Dakota, Inc., Menu Foods Holdings, Inc., Menu Foods Gen Par Ltd., Menu Foods Limited Partnership, and Menu Food Operating Partnership.

[5] Menu Foods also distributes its cat and dog food throughout the United States to retailers such

147083 v1                                    2

Care."

Like Menu Foods, Procter & Gamble recognized that its Iams and Eukanuba pet food lines were contaminated, and potentially lethal to pets, and issued a "voluntary recall" simultaneous with the Menu Foods Recall on March 16, 2007. *See* the March 16, 2007 Procter & Gamble Press Release, DePalma Decl., Exh. A. The contents of Procter & Gamble's press release minimized the very real risks associated with its products.

However, at some unknown time after the Recall and before May 16, 2007, Procter & Gamble retained claims adjuster Risk Enterprise Management Limited ("REM") to handle claims made by aggrieved pet owners. Although Procter & Gamble asserts P&G Pet Care has provided a toll-free number for consumers to call with questions or concerns about its products for over twenty (20) years (*see* the letter from D. Jeffrey Ireland to Michael David Myers, DePalma Decl., Exh. B), Plaintiff believes this toll-free number was wrongfully used to elicit information regarding pet owners' losses caused by P&G Pet Care lines. At times, Procter & Gamble used its own staff veterinarians to elicit information from pet owners. *See, e.g.*, the May 29, 2007 Declaration of Kerri Hamilton (the "Hamilton Decl."), at ¶¶ 6-7, attached to the DePalma Decl. at Exh. C. Procter & Gamble then used this information to contact pet owners in order to obtain releases and settle claims against Procter & Gamble and its subsidiaries.

The communications campaign carried out by Procter & Gamble is extremely alarming because of the ethical implications it raises. Procter & Gamble, through its agent REM, contacted named plaintiffs and pet owners even *after learning that the pet owner was represented by counsel*. Procter & Gamble otherwise contacted pet owners indiscriminately – with no effort made to determine if pet owners were a named plaintiff or otherwise represented by counsel. Despite these communications being designed to settle claims and release Procter & Gamble from liability, neither Procter & Gamble nor REM ever notified plaintiffs' counsel that

---

as Wal-Mart, Kroger and Safeway. In addition, these and other retailers sell Menu Foods pet food under their own respective private labels. The retailers have not yet been named as defendants in the cases before this Court. Investigation into their liability is ongoing.

147083 v1                                             3

such communications were impending or ongoing. It seems highly unlikely that Procter & Gamble's counsel were unaware that such communications occurred and continue to occur.

Todd Sokolowski is the named plaintiff in this action. Mr. Sokolowski's pet cat, Harley, died one day before the Recall was issued. *See* the June 11, 2007 Affidavit of Todd Sokolowski (the "Sokolowoski Aff."), at ¶ 3, attached to the DePalma Decl. at Exh. D. His other cat, Leo, is still undergoing treatment. *Id.* Both pets had eaten Iams brand cat food that was later recalled. *Id.* He was contacted by Jean Burke, a claims representative for REM, on or about June 6, 2007. *Id.* at ¶ 4. Mr. Sokolowski's class action lawsuit, naming the Iams Company as a defendant, had been on file in the District of New Jersey for almost two months at the time he was contacted by REM.[6] Nevertheless, REM sent Mr. Sokolowski a letter suggesting to Mr. Sokolowski that he "must contact Ms. Burke" to settle his claim. *Id.* at ¶ 4.

Carol Chiappetta's dog, Sandy, died after eating Iams pet food. *See* the June 8, 2007 Affidavit of Carol Chiappetta (the "Chiappetta Aff."), at ¶ 3, attached to the DePalma Decl. at Exh. E. On May 25, 2007, Ms. Chiappetta was contacted by a claims representative for REM. *Id.* at ¶ 4. "She told me that she wanted to settle my case against Iams." *Id.* Ms. Chiappetta then "explained to her that [she] was represented by an attorney and filed a class action, . . . " *Id.* at ¶ 5. Despite being informed that Ms. Chiappetta had legal representation, the REM claims representative called her again on June 4, 2007, "offer[ing] to pay veterinary bills, the cost of cremation, reimbursement for the cost of food, and $150.00 to replace Sandy." *Id.* at ¶ 5.

Kerri Hamilton fed her dogs Iams brand pet food. Hamilton Decl. ¶ 2. On March 6, 2007 – ten days before the recall – Ms. Hamilton's dog, Molly, became ill. Her veterinarian diagnosed Molly as having ingested a toxin. *Id.* at ¶ 3. The veterinarian could not treat Molly and had to euthanize her. *Id.* Her other two dogs also ate the Iams product but did not die. *Id.* at ¶ 5. After learning that the Iams pet food fed to her dogs was part of a massive recall, Ms. Hamilton contacted Iams through its Recall hotline and was connected to an Iams veterinarian

---

[6] *Sokolowski v. Menu Foods, Inc. et al.* was filed on April 9, 2007.

147083 v1                                    4

named Dr. Dicke. *Id.* at ¶¶ 4, 6.

Dr. Dicke collected substantial information regarding Ms. Hamilton's pets and the circumstances under which they became ill. *Id.* Dr. Dicke also contacted Molly's veterinarian to get additional information. In addition, he requested – and Ms. Hamilton sent – a packet of the unopened recalled food she had in her possession along with receipts showing that she had purchased the food. *At no time did Dr. Dicke ask if she was represented by counsel, advise her of her rights, or inform her of the pending class actions. Id.* at ¶¶ 6-7, 10. A few weeks later, Dr. Dicke called her back and advised that Iams would settle with her in exchange for a full release of any claims relating to her dogs and their past and future veterinary bills. Ms. Hamilton refused to sign the release.

Ms. Hamilton was contacted two more times by Iams. In these instances, she was contacted by Lynn McCahern, a claims manager for Risk Management Enterprise, and represented that she was calling on behalf of Iams. *Id.* at ¶¶ 8-9. Like Dr. Dicke, Ms. McCahern did not ask Ms. Hamilton if she was represented by counsel. However, even more egregious, Ms. McCahern undertook to advise Ms. Hamilton on the laws of Michigan, Ms. Hamilton's home state, and pressured her to sign a release after informing her that the laws of the state were unfavorable to Ms. Hamilton's claims. *Id.* This legal advice was provided without REM informing her of existing litigation or of her ability to obtain a lawyer of her own, and after being offered a settlement in exchange for releasing Procter & Gamble from liability.

After learning Procter & Gamble had been communicating with pet owners who are represented by counsel, plaintiffs' counsel wrote a letter to Procter & Gamble's counsel on May 10, 2007, notifying them of these improper contacts. *See* DePalma Decl., Exh. B. Less than a week later, on May 16, 2007, Procter & Gamble replied by letter and agreed to refrain from contacting "any consumer who has brought suit against Procter & Gamble or Iams and is currently a named plaintiff in a class action lawsuit to discuss issues relating to the pet food recall." *Id.* Nevertheless, REM sent a letter to Mr. Sokolowski, a named plaintiff, on May 31, 2007. Ms. Chiappetta was contacted on May 25, 2007 and, after informing REM she was

represented by counsel and had filed a class action lawsuit, was contacted by REM again on June 4, 2007.

Furthermore, even were Procter & Gamble to cease contacts with named plaintiffs and represented pet owners, cessation does not cure past and ongoing communications. Discontinuing its improper contacts, for example, does not nullify releases and settlements that have been wrongfully obtained and provides no mechanism for screening out contacts with represented parties in the future. Procter & Gamble has not indicated that it will provide curative measures on its own. In fact, Procter & Gamble has expressly "rejected" the idea that its "discussions with any consumers have any possibility of undue influence." *Id.*

Allowing these misleading and coercive communications to continue unregulated will have a permanent and deleterious effect on the rights and claims of potential class members. Such abuses may only be remedied through the attention of this Court by entry of a Protective Order under Fed.R.Civ.P. 23(d) that corrects the communications that have occurred and regulates the terms under which such communications will occur in the future.

## II. LEGAL ARGUMENT

### A. Procter & Gamble Has Conducted Wrongful Communications With Named Plaintiffs And Pet Owners Known To Be Represented By Counsel

Court regulation of communications with putative class members is particularly essential where represented parties are being contacted and professional rules of conduct are potentially being violated in the process. N.J. Ct. R., R. Prof. Conduct 4.2 ("Rule 4.2") governs attorneys before the District of New Jersey. *See, e.g., Curley v. Cumberland Farms, Inc.*, 134 F.R.D. 77, 83 (D.N.J.1990). Rule 4.2 "precludes an attorney *or someone acting on his behalf*, from communicating with a party that the attorney knows is represented by counsel. . . ." *In re Envtl. Ins. Declaratory Judgment Actions*, 252 N.J. Super. 510, 516 (1991) (emphasis added).

"There is a dearth of authority specifically addressing when an attorney has violated the rules of professional conduct 'through the acts of another.'" *Holdren v. Gen. Motors Corp.*, 13 F. Supp. 2d 1192, 1195 (D. Kan. 1998). However, where courts have spoken on this issue, this

147083 v1                                        6

relationship has been satisfied by a wide range of conduct. For instance, courts have held that an attorney violates rules of professional conduct "through the acts of another" where the attorney has actually requested or engineered contacts made by his or her client with other represented parties. *See id.* (citing *In re Marietta*, 223 Kan. 11 (1977)). However, at least one court has indicated that "an attorney's mere knowledge of a client's contact or action is sufficient to constitute an ethical violation." *Holdren*, 13 F. Supp. 2d at 1195 (citing *Massa v. Eaton Corp.*, 109 F.R.D. 312, 313 (W.D. Mich. 1985)).

Although it is unclear precisely where defense counsel are located on this spectrum, defense counsel, at least, had mere knowledge that REM was contacting represented pet owners. The communications at issue here are as, if not more, egregious than the Menu Foods' communications that were before this Court just last month.

This Court expressed deep concern over Menu Foods' contacts with pet owners known to be represented by counsel.

> I think it's absolutely incumbent upon me and [defense counsel] and [Menu Foods] to find out if [Menu Foods] sent any of these letters to represented persons. I am disturbed that . . . [Menu Foods], represented by counsel, would not undertake efforts to exclude those people from [its communications] and not make efforts to exclude those people from subsequent efforts to contact them . . . [A] lawyer who allows such conduct to occur or such contact to occur even through an agent, and even especially through an agent, may be engaging in unethical conduct.

*See* the Transcript of the May 18, 2007 hearing in *Workman et al. v. Menu Foods et al.*, Case No. 1:07-cv-01338-NLH-AMD ("Transcript, May 18, 2007") [Docket No. 19], at pages at 61-62, attached to the DePalma Decl. at Exh. G. Similar to Menu Foods' communications, Procter & Gamble contacted named plaintiffs and pet owners who indicated they were represented by counsel. These communications occurred in blatant disregard of this Court's warnings to Menu Foods and the Consent Order filed on June 4, 2007. *See* the Consent Order filed on June 4, 2007 in *Workman et al. v. Menu Foods et al.*, Case No. 1:07-cv-01338-NLH-AMD [Docket No. 31], attached to the DePalma Decl. at Exh. H. Defendant was made aware of these hearings and the

Consent Order at least as early as May 29, 2007, when notice was provided to the Judicial Panel on Multidistrict Litigation ("Panel") of the recent activity in this Court.[7] Notice that these papers were filed with the Panel was served on D. Jeffrey Ireland, defense counsel for Iams.[8] However, despite obvious concern by this Court, Procter & Gamble continued its communications campaign.

On May 25, 2007, Ms. Chiappetta explained to a claims representative for REM that she was represented by an attorney and had filed a class action lawsuit. Chiappetta Aff. ¶ 5. However, even after being informed of this, the REM claims representative called again a little over a week later, on June 4, 2007, and again made an offer to settle Ms. Chiappetta's claim against Iams. *Id.* As mentioned above, Mr. Sokolowski's class action lawsuit, naming Iams as a defendant, was on file for almost a full two months by the time REM contacted him. Nevertheless, REM sent Mr. Sokolowski a letter on May 31, 2007 indicating that he "must contact Ms. Burke," an REM claims adjuster, to settle his claim. Sokolowski Aff., ¶ 4. All of these communications took place after defense counsel for Procter & Gamble had been made aware of this Court's express warnings to Menu Foods or after REM was directly informed by pet owners that they were represented by counsel.

In addition, plaintiffs' counsel contacted defense counsel as early as May 10, 2007 to inform them that REM was communicating with represented pet owners in an effort to settle claims. *See* DePalma Decl., Exh. B. On May 16, 2007, defense counsel sent a letter assuring plaintiffs' counsel that REM would cease its communications with named plaintiffs or "any

---

[7] Plaintiff Movant Christina Troiano's Notice of Significant Activity in Related Action Pending in the District of New Jersey, *In re: Pet Food Products Liability Litigation*, Docket No. 1850, attached to the DePalma Decl. at Exh. I.

[8] *See* Panel attorney service list, Plaintiff Movant Christina Troiano's Notice of Significant Activity in Related Action Pending in the District of New Jersey, *In re: Pet Food Products Liability Litigation*, Docket No. 1850, attached to the DePalma Decl. at Exh. I. Furthermore, this Court's hearings on Menu Foods' communications were publicly available and readily accessible to Procter & Gamble and its counsel through online resources. *See, e.g.*, the online articles attached at DePalma Decl., Exh. F.

147083 v1

8

consumer who has brought suit against Procter & Gamble or Iams . . ." *Id.* However, defense counsel's assurances proved to be hollow in that both Ms. Chiappetta and Mr. Sokolowski were contacted by REM only a few weeks later.

Menu Foods' communications with pet owners who were known to be represented prompted Judge Hillman to seek "affidavits from the lawyers who appeared in [the *Workman*] case, . . . [and ask] what lawyers have been involved in advising Menu Foods about contacts with the putative class and . . . where each of those lawyers is admitted to practice law." *See* the Transcript of the May 23, 2007 hearing in *Workman et al. v. Menu Foods et al.*, Case No. 1:07-cv-01338-NLH-AMD ("Transcript, May 23, 2007") [Docket No. 29], at page 21, attached to the DePalma Decl. at Exh. J. Procter & Gamble's conduct in this case may be even more troublesome and deserves intense scrutiny by this Court. Such communications with named plaintiffs and represented parties will assuredly continue without judicial intervention.

### B. The District Court Has Broad Authority To Regulate Communications With The Putative Class

Federal Rule of Civil Procedure 23(d) provides district courts with broad authority to regulate communications between defendants and putative class members prior to class certification. *See, e.g., Gulf Oil v. Bernard*, 452 U.S. 89 (1981); *Jenifer v. Delaware Solid Waste Auth.*, Nos. 98-270/98-565 MMS, 1999 U.S. Dist. LEXIS 2542, at *8 (D. Del. Feb. 25, 1999); *In re Medtronic, Inc., Implantable Defibrillator Prods. Liab. Litig.*, 434 F. Supp. 2d 729, 730 n.1 (D. Minn. 2006) (holding that the court's duty to protect class members applies even in an MDL proceeding prior to class certification).[9]

While defendants may send truthful, non-coercive communications to absent class members pre-certification, courts have a responsibility to regulate misleading communications.

---

[9] The standards applicable to Procter & Gamble's communications with putative class members are the same as those briefed in connection with Plaintiffs' Motion for Order to Show Cause Why a Protective Order to Supervise or Limit Communications with Absent Class Members Should Not Issue in *Workman et al. v. Menu Foods et al.*, Case No. 1:07-CV-01338-NLH-AMD [Docket No. 10], DePalma Decl., Exh. H.

*See, e.g., Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 845 (2d Cir. 1980). As the Court has already recognized, "I have an obligation to protect the putative class and to prevent abusive conduct, . . ." Transcript, May 23, 2007, at 23.

The court need not wait for actual harm to occur before it exercises its regulatory power. *See, e.g., In re Sch. Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988) ("Rule 23(d) does not, however, require a finding of *actual* harm; it authorizes the imposition of a restricting order to guard against the '*likelihood* of serious abuses.'") (citing *Gulf Oil*, 452 U.S. at 104) (second emphasis added)). The potential for harm is sufficient to invoke the court's protection through restrictions on communications or other measures. Such a restriction "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. . . . such a weighing should . . . limit[] speech as little as possible, . . . ." *Gulf Oil*, 452 U.S. at 101-02 (footnotes omitted).

### C. Procter & Gamble's Contact With Potential Class Members Is Improper

Courts often restrict defendants' contacts with putative class members where the contacts are designed to influence class members' decisions to participate in the litigation or adversely impact the remedies available to potential class members. Such contacts undermine the purpose and efficacy of the class action device. These concerns are implicated by Procter & Gamble's communications. As a result, judicial regulation is necessary in order to ensure that proper information is provided to pet owners contacted by Procter & Gamble or REM, as well as to protect the rights of putative class members from whom critical information and concessions have already been elicited. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (stating that communications that omit critical information and threaten the choice of remedies available to class members are "subject to a district court's supervision."). Procter & Gamble's communication campaign is a vehicle for improperly settling claims and limiting the size of the potential class. *See, e.g., Jenifer*, 1999 U.S. Dist. LEXIS 2542, at *9 ("improper communications could diminish the size of the . . . potential class, and thus, reduce the potential liability") (citations omitted).

### 1. Procter & Gamble's Communications Are Transactional, Not Informational

Courts have recognized the right of defendants to conduct informational communications with class members prior to class certification. However, such communications have been deemed improper by courts where they are conducted for transactional purposes. Courts have held that communications that are "not informational but transactional and designed to take rights away from [putative class members]" require curative action by the district court. *In re Currency Conversion Fee*, 361 F. Supp. 2d at 254.

Procter & Gamble's communications are clearly transactional. Its telephonic and written communications with pet owners consist of specific inquiries and settlement offers regarding, for example, veterinary bills, the cost of cremation, the cost of food and even the value of one's deceased pet. *See, e.g.*, Chiappetta Aff., ¶ 5. Procter & Gamble, through REM, has also asked pet owners to discuss the cause of their pets' sickness and death, and the health history of the pet. Hamilton Decl., ¶ 6.[10] Its communications campaign elicits responses from pet owners that impair, if not forfeit, their claims in this litigation, and is geared only towards releasing Procter & Gamble from liability. These communications are designed purely to take rights away from putative class members and demand intervention by the court. *See In re Currency Conversion Fee*, 361 F. Supp. 2d at 253-54.

The type of content one would expect, were these communications informational, are evident. For example, Procter & Gamble could have provided information on pending litigation,

---

[10] It is noteworthy that Procter & Gamble's collection of such data also constitutes unauthorized discovery on these absent class members. Discovery upon the absent class is only authorized in exceptional circumstances and where the proponent of such discovery has satisfied a heavy burden. *See On the House Syndication, Inc. v. Federal Express Corp.*, 203 F.R.D. 452, 455 (S.D. Cal. 2001) (wide-ranging discovery from absent class members undermines the very purpose of class action suits); *Collins v. Int'l Dairy Queen*, 190 F.R.D. 629, 630-31 (M.D. Ga. 1999) ("absent class-action plaintiff is not required to do anything"); *Morgan v. United Parcel Serv. of Am., Inc.*, No.4:94-CV-1184,1998 U.S. Dist. LEXIS 20197, at *3 (E.D. Mo. Oct. 16, 1998) ("strong showing" required for absent class member discovery); *Redmond v. Moody's Investor Serv.*, No. 92 Civ. 9161 (WK), 1995 U.S. Dist. LEXIS 6277, * 3 (S.D.N.Y May 10, 1995) (discovery of absent class members regarding individual issues is inappropriate).

how to care for a pet that became ill after ingesting recalled pet food, alternative food suggestions, or clarified information about products and medical disorders associated with the Recall. Yet, Procter & Gamble provided no such information.

As mentioned above, an REM claims representative contacted Ms. Chiappetta on, at least, two occasions with offers to settle her claims against Iams. Chiappetta Aff., ¶¶ 4-5. REM made these offers after Ms. Chiappetta provided information about expenses relating to the care of her dog, which passed away after eating Iams pet food. *Id.* However, it does not appear Ms. Chiappetta was ever informed of her right to pursue relief through the judicial system, of the status of the Recall, or about the products and medical disorders associated with the Recall.

Similar offers were made to Mr. Sokolowski. REM contacted Mr. Sokolowski, the named Plaintiff in this case, to settle his claims against Iams. Sokolowski Aff., at ¶ 4, Ex. A. However, it also does not appear REM ever provided him with any information about the Recall, pending litigation, or regarding the care and treatment of his other pet that also ingested recalled Iams pet food.

In addition, substantial information was collected from, but not provided to, Ms. Hamilton. Hamilton Decl., ¶ 6. Dr. Dicke, a veterinarian for Procter & Gamble, collected information on Ms. Hamilton's pets and the circumstances under which they became ill. *Id.* Dr. Dicke even collected information from the veterinarian Ms. Hamilton used to treat and diagnose her dogs and requested that Ms. Hamilton send any unopened recalled food along with receipts showing that she had purchased the food. *Id.* Thereafter, Ms. Hamilton was asked to settle claims with Iams on three separate occasions. Hamilton Decl., ¶¶ 7-9. It does not appear that Procter & Gamble and REM representatives ever provided information, for example, on how to properly care for her other dogs that were ill, but survived after eating contaminated Iams pet food. She was "never asked if [she] had an attorney or was represented by counsel." *Id.*, at ¶ 9.

Consequently, because communications with potential class members only set out to settle claims and obtain releases from liability, these communications are purely transactional, and as a result, are improper.

### 2. Procter & Gamble's Unilateral Communications Are Coercive And Misleading

Procter & Gamble's one-sided communications, without the input of plaintiffs' counsel or the court, are inherently dangerous and represent precisely the types of communications courts have regulated in order to protect the integrity of the judicial process. The unilateral nature of the communications and offers of settlement enhance the impropriety of these communications. *See, e.g., Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202 (11th Cir. 1985) ("A unilateral communications scheme . . . is rife with potential for coercion."). Such unilateral communications have been deemed to deceive and undermine informed participation in class action litigation. "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the fact, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Id.* at 1203 (citations omitted).

These communications are particularly coercive in that REM suggests that its settlement process is the only available process for obtaining relief. Procter & Gamble essentially holds itself out as the sole arbiter of the information provided to it and makes a "take it or leave it offer" based on that information. *See, e.g.*, Hamilton Decl., ¶ 8.

For example, Mr. Sokolowski, the named Plaintiff in the instant lawsuit, was under the impression that the letter he received from REM indicated that he "must contact Ms. Burke," a claims representative for REM. Sokolowski Aff., ¶ 4. The letter urges him to contact REM "as soon as possible. [REM] cannot proceed with . . . your claim without speaking with you." *Id.*, at Ex. A. Furthermore, Ms. Hamilton indicates that a claims representative with REM even offered legal advice to her, suggesting that the laws of her home state, limited her scope of recovery. *Id.*, at ¶ 9. The claims representative also "stated that the offer to pay [Ms. Hamilton's] vet bills was a 'take it or leave it offer' . . . [Ms. Hamilton] felt as if [the claims representative] was attempting to pressure [her] into accepting Iams' offer." *Id.*, at ¶ 8.

Procter & Gamble's communications are particularly misleading because of the

information they fail to provide. As alluded to earlier, at no time during its communications with pet owners does Procter & Gamble ask if the pet owner is represented by counsel or advise the pet owner that approximately 100 class action lawsuits have been filed in connection with the Recall. Courts have held that withholding information about the existence of underlying litigation in unilateral communications with potential class members warrants court intervention. *See, e.g., Ralph Oldsmobile, Inc. v. Gen Motors Corp.*, No. 99 Civ. 4567 (AGS), 2001 U.S. Dist. LEXIS 13893, at *12 (S.D.N.Y. Sept. 7, 2001); *see also In re Sch. Asbestos Litig.*, 842 F.2d at 681, 683. Omitting any reference to pending litigation and collecting information under the guise of being helpful easily, and perhaps deliberately, lulls pet owners to believe that the "data" provided to Procter & Gamble are in no way associated with that pet owner's legal rights or hinder participation in existing lawsuits. Of course, this is far from the truth.

Moreover, Procter & Gamble's communications with putative class members provide no information about plaintiffs' counsel, and plaintiffs' counsel received no notice before contacts were made with putative class members. These glaring and significant omissions occurred despite pet owners explicitly informing REM that they were represented by counsel. Courts have indicated that such information and notice are critical ingredients for permitting unsupervised transactional communications. *See, e.g., Weight Watchers, Inc. v. Weight Watchers Int'l, Inc.*, 455 F.2d 770, 772 (2d Cir. 1972); *see also Ralph Oldsmobile Inc.*, 2001 U.S. Dist. LEXIS 13893 at *16.

Procter & Gamble's communications campaign operates as an end-run around this Court's control under Rule 23(d)(2) to direct notice to the class "for the protection of the members of the class or otherwise for the fair conduct of the action . . . ." Thus, Procter & Gamble's contacts constitute "a solicitation scheme that relegates the essential supervision of the court to the status of an afterthought." *Kleiner*, 751 F.2d at 1202. "The solicitation of exclusions from a pending class action by a defendant *before* the court has determined that the case may proceed as a class action constitutes a serious challenge to the authority of the court to have some control over communications with class members." 5 *Newberg on Class Actions* § 15:19 (4th

147083 v1                                14

ed.) (emphasis supplied). Here, Procter & Gamble has attempted to seize upon the absence of a certified class to sidestep this Court's Rule 23 oversight function.

### D. Proposed Remedy

This Court has a duty to protect the absent class members, to act as a neutral arbiter, and to ensure the honesty, accuracy, and appropriateness of communications between Menu Foods and the Class. Likewise, Class Counsel have a fiduciary duty to potential class members. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1245-46 (N.D. Cal. 2000).[11] Procter & Gamble's unilateral campaign makes it impossible for either the Court or Class Counsel to carry out their responsibilities to protect the Class.

To remedy the potential harm to the Class and to supervise such activities in the future, plaintiff respectfully seeks an order from this Court granting the following relief:

(1) Require Procter & Gamble to obtain the Court's approval prior to conducting any further communications with absent Class members;

(2) Authorize the Clerk of the Court to send, at Procter & Gamble's expense, a curative letter approved by the Court, to any absent Class members who have received any communication from Procter & Gamble regarding this litigation for the purpose of advising them of the status of the litigation, the procedural history, and to set forth all of their options;

(3) Deem null and void any executed releases and settlements that were obtained as a result of the prior misleading communications, until such time as Class Counsel have had the opportunity to communicate directly with the absent Class members who were the target of Procter & Gamble's communications campaign;

(4) Require Procter & Gamble to produce within seven (7) days copies of all communications to and from named representatives and absent Class members who are represented by counsel, including copies of all veterinary records or bills, all other documents or items requested and received by Procter & Gamble through its communications, and any releases obtained from named representatives and absent Class members represented by counsel;

(5) Require Procter & Gamble to maintain the integrity of any pet food received from any

---

[11] A "constructive attorney-client relationship" exists between class counsel and potential class members. 5 *Newberg on Class Actions* § 15:14 (4th ed.); *see Kleiner*, 751 F.2d at 1207 n.28.

named representatives and absent Class members who are represented by counsel as a result of its communications and to cease conducting any additional testing on such pet food until such time as plaintiffs' counsel can coordinate with Procter & Gamble the shared custody of such pet food;

(6) Any information obtained from named representatives or absent Class members through Procter & Gamble's communications campaign shall not be used by Procter & Gamble to settle claims at this time; and

(7) Any other relief the Court deems appropriate under these circumstances.

### III.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a Protective Order pursuant to Fed.R.Civ.P. 23(d) limiting or supervising Procter & Gamble's further communications with potential class members and cure the wrongful communications that have already occurred.

Dated:  June 18, 2007

**LITE DePALMA GREENBERG & RIVAS, LLC**

By:/s/ Joseph J. DePalma
Joseph J. DePalma, Esq.
Katrina Blumenkrants, Esq.
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone:  (973) 623-3000
Facsimile:  (973) 623-0211

**NEWMAN, CREED & ASSOCIATES**
Bruce E. Newman, Esq.
Kevin E. Creed, Esq.
99 North Street, Rte. 6
P.O. Box 575
Bristol, CT 06011-0575
Telephone:  (860) 583-5200
Facsimile:  (860) 582-0012

*Attorneys for Plaintiff and the Class*