IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TODD SOKOLOWSKI, Individually and on Behalf of All Others Similarly Situated, | : | CASE NO. 1:07-cv-01709-NLH-AMD |
| | : | |
| | : | (Judge Noel L. Hillman) |
| Plaintiff, | : | (Magistrate Ann Marie Donio) |
| | : | |
| v. | : | |
| | : | |
| MENU FOODS, INC., et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

## DEFENDANT THE IAMS COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A PROTECTIVE ORDER

Respectfully submitted,

OF COUNSEL:

D. Jeffrey Ireland (Ohio Bar No. 0010443)
Brian D. Wright (Ohio Bar No. 0075359)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow St.
Dayton, OH 45402
Telephone: (937) 227-3710
Telecopier: (937) 227-3749
E-mail: djireland@ficlaw.com

Francis McGill Hadden (FH-4564)
Alan R. Gries (AG-8151)
Lauren V. Amjed (LA-7853)
GIBBONS P.C.
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2769
Telephone: (215) 446-6275
Telecopier: (215) 446-6305
E-mail: fhadden@gibbonslaw.com

Attorneys for Defendant
The Iams Company

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND SUMMARY ............................................................. 1

II.   IAMS' CONSUMER CARE SPECIALISTS AND VETERINARIANS
      PROVIDE NEEDED ASSISTANCE TO CUSTOMERS WHO CONTACT
      IAMS DIRECTLY ..................................................................................... 5

      A.    Iams Has Relied Upon a Customer Service Line to Assist Customers for
            Over 25 Years ............................................................................... 5

      B.    After the Menu Foods Recall, Iams' Customer Service Line and
            Reimbursement Program Expanded to Meet the Needs of Its Customers.............. 6

      C.    Resources Were Added to Respond to Customers' Calls About
            Reimbursement of Expenses........................................................... 8

      D.    As Iams Became Aware of Certain Issues, Iams Revised Its Processes and
            Procedures.................................................................................... 9

      E.    Iams' Procedures Prevent Contact with Represented Parties................................ 10

      F.    Iams Has Informed Customers Signing Releases of the Pendency of the
            Class Actions ............................................................................... 13

III.  THERE IS NO EVIDENCE THAT IAMS HAS ACTED IMPROPERLY ..................... 14

      A.    There Is No Evidence of Abusive Conduct ........................................... 15

      B.    Prohibiting Iams From Communicating with Putative Class Members
            Violates the First Amendment .......................................................... 18

      C.    Iams Has a Right to Interact with Its Customers ................................... 20

IV.   IAMS HAS NOT ENGAGED IN IMPROPER COMMUNICATION WITH
      PUTATIVE CLASS MEMBERS AND A PROTECTIVE ORDER IS NOT
      WARRANTED ......................................................................................... 22

      A.    Settlement Is Encouraged and Does Not Constitute Coercive
            Communication............................................................................. 22

      B.    Iams' Claim Reimbursement Process Seeks to Make Customers Whole and
            Therefore Cannot Be Coercive ......................................................... 25

      C.    The Conditions that Led to the Consent Order Before This Court Do Not
            Exist with Iams' Reimbursement Program........................................... 26

i

|  |  |  |  |
|---|---|---|---|
| | 1. | Iams is Not Contacting Represented Parties or Named Plaintiffs | 27 |
| | 2. | Iams Does Not Require Customers to Fill Out Any Data Collection Forms | 27 |
| | 3. | Iams Does Not Require Most Customers to Sign Release Forms | 28 |
| V. | | PLAINTIFF'S REQUESTED REMEDY DRAMATICALLY EXCEEDS REMEDIES APPROPRIATE UNDER LAW | 28 |
| VI. | | CONCLUSION | 29 |

## TABLE OF AUTHORITIES

Page

I.    **CASES**

Bernard v. Gulf Oil Co., 619 F.2d 459 (5th Cir. 1980), aff'd, 452 U.S. 89,
101 S. Ct. 2193 (1981)..........................................................................................15

Bublitz v. E.I. DuPont de Nemours & Co., 196 F.R.D. 545 (S.D. Iowa 2000).................22

Burrell v. Crown Cent. Petroleum, Inc., 176 F.R.D. 239 (E.D. Tex. 1997) .......................18

Cada v. Costa Line, Inc., 93 F.R.D. 95 (N.D. Ill. 1981) .....................................................23

Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc., 214 F.R.D. 696
(S.D. Ala. 2003) ..........................................................................................15, 21, 25

Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., 206 F. Supp.
2d 559 (S.D.N.Y. 2002), aff'd, 2002 U.S. Dist. LEXIS 11877 (S.D.N.Y.
July 1, 2002) ..................................................................................................... 15-16

Erhardt v. Prudential Group, Inc., 629 F.2d 843 (2d Cir. 1980)........................................17

Gates v. Cook, 234 F.3d 221 (5th Cir. 2000)......................................................................19

In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106 (7th Cir.),
cert. denied, 444 U.S. 870, 100 S. Ct. 146 (1979) .......................................24

Gulf Oil Co. v. Bernard, 452 U.S. 89, 101 S. Ct. 2193 (1981)..................14, 15, 16, 18, 29

Haffer v. Temple Univ. of Commonwealth Sys. of Higher Educ., 115 F.R.D. 506
(E.D. Pa. 1987)..........................................................................................................16

Hammond v. Junction City, 167 F. Supp. 2d 1271 (D. Kan. 2001)....................................17

Hampton Hardware, Inc. v. Cotter & Co., 156 F.R.D. 630 (N.D. Tex 1994)....................16

Icicle Seafoods, Inc. v. Baker (In re The Exxon Valdez), 229 F.3d 790
(9th Cir. 2000)...........................................................................................................23

Impervious Paint Indus., Inc. v. Ashland Oil, 508 F. Supp. 720 (W.D. Ky. 1981)...........16

Jenifer v. Delaware Solid Waste Auth., Nos. 98-270/98-565, 1999 U.S. Dist.
LEXIS 2542 (D. Del. Feb. 25, 1999)................................................................14, 17

Kleiner v. First Nat'l Bank, 751 F.2d 1193 (11th Cir. 1985) ................................16, 17, 18

Lee v. Am. Airlines, Inc., No. 3:01-CV-1179-P, 2002 U.S. Dist. LEXIS 2232
(N.D. Tex. Feb. 12, 2002)...................................................................................19, 21

In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1239 (N.D. Cal. 2000) .........17

McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 295 (D. Mass. 2004) ...........................23

Migliore v. Menu Foods, Case No. 07-CV-0575-RSL (W.D. Wash.) ................................9

In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132 (2d Cir. 1998) .................................22

Payne v. Goodyear Tire & Rubber, 207 F.R.D. 16 (D. Mass. 2002)...........................18, 23

Rankin v. Board of Educ. of the Wichita Public Schs., 174 F.R.D. 695 (D. Kan.
1997) ...............................................................................................................20, 21

In re Sch. Asbestos Litig., 842 F.2d 671 (3d Cir. 1988).........................................14, 16, 17

Tedesco v. Mishkin, 629 F. Supp. 1474 (S.D.N.Y. 1986).................................................16

Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc., 455 F.2d
770 (2d Cir. 1972)..................................................................................................22

## II.    STATUTES

Fed. R. Civ. P. 23 ...............................................................................................14, 20, 22

Fed. R. Civ. P. 23(d) ................................................................................................17, 19

## III.    OTHER AUTHORITIES

Manual for Complex Litigation (Third) § 30.24, at 232-33 (1995).............................18, 22

5 NEWBERG ON CLASS ACTIONS § 15:14, at 55-56 (2002).................................................20

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.24, at 233 (1995) ...............................21

**DEFENDANT THE IAMS COMPANY'S MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S EMERGENCY MOTION FOR A PROTECTIVE ORDER**

I.              INTRODUCTION AND SUMMARY

On June 18, 2007, Plaintiff filed an Emergency Motion for Protective Order in which it seeks to abridge Defendant, The Iams Company's[1] First Amendment right to communicate with--and provide critical assistance and reimbursements to--customers whose pets may be experiencing adverse health effects due to contaminated pet food. In support of its Motion, plaintiff asserts that Iams has engaged in coercive and misleading communications with represented and unrepresented putative class members, and that such communications were designed to foreclose the legal rights of named plaintiffs and potential class members. Plaintiff's claims in this regard are erroneous. Following announcement of the recall, Iams implemented and adapted protocols and procedures for responding to the critical needs of its customers, while ensuring that it was not communicating with named plaintiffs or customers who had retained counsel.

Plaintiff has submitted three Affidavits which purportedly demonstrate that Iams deliberately communicated with named plaintiffs and customers represented by counsel. The true circumstances underlying each Affidavit, however, underscore the efforts Iams has made to respond to its customers' immediate and critical needs while ensuring that it did not communicate with individuals who were represented.

---

[1] The Iams Company dba P&G Pet Care, manufactures and sells Iams and Eukanuba brand premium dog and cat food products. Iams is a wholly owned subsidiary of The Procter & Gamble Company ("P&G").

Specifically, Iams provides its customer service representatives a continually updated list of all named Plaintiffs in all pending Class Actions against Menu Foods or Iams (including the 90 or more Class Actions that do not name Iams or P&G as a defendant). Additionally, Iams instructs its representatives that under no circumstances should there be any communications with any named Plaintiffs. Iams also implemented a policy instructing its representatives that the first question they must ask, before engaging in any discussions with a customer, is whether the customer is represented by counsel or part of a class action lawsuit; if the customer is represented or part of a class action, then the telephone call must be terminated immediately[2] and no further contact with that person is permitted.[3] Iams also hired Risk Enterprise Management Limited ("REM") to assist in responding expeditiously to the large number of communications it received following the recall announcement, and took appropriate and effective steps to ensure the REM complied with the same policies and procedures.

As stated, Iams' commitment to the aforementioned policies and procedures is demonstrated by the circumstances surrounding its communications with the following plaintiffs:

1.   Kerri Hamilton:  Ms. Hamilton admits that "once I advised them that I had retained counsel, my communication with them stopped." K. Hamilton Decl., ¶ 10.

2.   Todd Sokolowski:  Plaintiff's counsel misspelled Plaintiff's name on the caption of the Class Action Complaint as "Sokolwski." As a result of the confusion created by that misspelling, REM sent a letter to Mr. Sokolowski not knowing that he was a named plaintiff and represented by counsel.

---

[2] If represented, Iams' Specialists and REM's representatives ask the customer to have their attorney contact Iams or REM.

[3] Attached as Exhibit 5 to the Declaration of M. Hissong ("Hissong Decl.") (attached as Exhibit A) is a copy of the script that all Iams and REM representatives are required to follow when discussing concerns about the recall with Iams' customers.

3.     <u>Carol Chiappetta</u>:  On June 1, 2007, REM called Ms. Chiappetta to follow
up on prior communications. Ms. Chiappetta stated that "she will join the
class action." REM understood that to mean that she was not yet
represented by counsel, and told her it would call at a later date to
determine whether she had decided to join the class action. On June 4,
2007, REM called back as promised, and Ms. Chiappetta stated that she
had retained an attorney. At that point, REM ceased communications with
Ms. Chiappetta.

In short, Iams did not deliberately communicate with any of the affiants after

learning that they had in fact retained counsel, and Iams has instituted reasonable and appropriate

procedures to prevent communications with any named plaintiff or represented party.

Unlike the dedicated and aggressive settlement campaign created by Menu Foods,

Iams' customer communications arise solely from the Customer Service Line it has operated for

over twenty-five (25) years. Iams' Customer Service Line is one of the hallmarks of Iams'

goodwill -- a commitment to customer service and pet health. Iams' Customer Service Line

receives hundreds of thousands of communications from customers every year. In connection

with the pet food recall alone, the Customer Service representatives have had over 210,000

contacts from customers desiring health information and/or seeking reimbursement for their

recall-related pet care expenses. The Court must therefore recognize Iams' First Amendment

rights and the critical role of the Iams Customer Service Line in responding to hundreds of

thousands of contacts, against the three Affidavits submitted by Plaintiffs (which either

mischaracterize the events, or fail to include pivotal facts).

Decisions by the United States Supreme Court, the Third Circuit, and many other

courts establish that Iams may communicate with putative class members and may enter

settlement agreements with them.[4] Plaintiffs appear to acknowledge that right, but are attempting to needlessly restrict it in this case based on their erroneous assertion that Iams has not informed putative class members (who have signed releases) that class actions are pending. In reality, however, Iams has notified all customers from whom it has sought a release (a very small number of people) that class actions are pending, that they may be able to participate in those Actions, that the customer should seek the advice of counsel, and that the customers' options include: signing the release, contacting counsel about the pending Actions or doing nothing.

Iams has provided notice of the Class Actions to its customers in several ways. First, for all customers who receive a release from Iams after May 24, Iams provides a letter explaining this information in detail. Second, for all customers who signed releases prior to June 13, Iams provided a letter on June 14, advising such customers that they could rescind their settlement agreement and release at any time by returning the settlement funds. In short, Iams has fully and fairly advised customers who have signed a release that Class Actions are pending and that they have numerous options for protecting their rights. As of the filing of this Memorandum, no Iams customer has given up any right to participate in this litigation--that fact cannot be overstated.

This Court should therefore deny Plaintiff's Motion in its entirety and permit Iams to continue to communicate with and provide assistance to its customers during this difficult time. If granted, then Plaintiff's motion will preclude Iams from communicating critical pet care

---

[4] This Court recognized this right during the Menu Foods hearing in the Workman case on May 23, 2007. Transcript of the May 23, 2007 hearing, pp. 19-20, excerpts attached as Exhibit E (recognizing Menu Foods' right to settle matters out of court and communicate information).

information in a timely fashion to the very individuals their motion is purportedly designed to protect.

II.      **IAMS' CONSUMER CARE SPECIALISTS AND VETERINARIANS PROVIDE NEEDED ASSISTANCE TO CUSTOMERS WHO CONTACT IAMS DIRECTLY**

        A.      Iams Has Relied Upon a Customer Service Line to Assist Customers for Over 25 Years

Iams' mission is to enhance the well-being of dogs and cats. Iams achieves that mission by developing close relationships with its customers, satisfying its customers' needs for information and assistance through its Customer Service Line and by providing superior quality dog and cat food products. Declaration of Marti Hissong ("Hissong Decl."), ¶¶ 3-4 (attached as Exhibit A). Every Iams product contains a 100% money back guarantee, which is published by Iams on its website and on much of its packaging. Id. ¶ 5.[5] Product packaging also encourages its customers to contact Iams' Customer Service Line with questions, comments or to request a refund. Id. ¶ 3. Annually, Iams receives hundreds of thousands of communications from customers who trust, appreciate and rely upon Iams' commitment to customer service and product excellence. Iams has been responding to the needs of its customers in this fashion for more than 25 years. Id. ¶ 2.

Iams' Customer Service Department assists customers with a broad range of pet issues, including problems with Iams' products. Hissong Decl., ¶ 5. Customers contact Iams' Customer Service Line routinely about heath and nutrition, care and feeding, training and behavior. Id. ¶ 6. Iams staffs its Customer Service Line with specially trained employees,

---

[5] Iams' Customer Service Line has published its guarantee on every Iams package for over 25 years and on Iams' website since its inception. Id. ¶ 2.

including veterinarians and veterinary technicians. Id. ¶ 4. Specialists receive approximately 90 hours of pet nutrition, behavior and product training each year and have access to on-site veterinarians who are employed by Iams to assist with answering customer questions. Id.

Through the use of its Customer Service Line and the guarantee provided with its products, Iams has built an enormous amount of customer goodwill, which it enjoys and protects today. Hissong Decl., ¶ 30. An essential part of Iams' goodwill derives from its dedication and diligence in responding to customer needs and concerns.[6]

B.    After the Menu Foods Recall, Iams' Customer Service Line and
      Reimbursement Program Expanded to Meet the Needs of Its Customers

On March 16, 2007, Menu Foods issued the first in a series of voluntary recalls of certain pouched and canned pet food products that were manufactured in two of its facilities (Kansas and New Jersey). Hissong Decl., ¶ 9. Concerned about the safety of its products and its customer's pets, Iams announced a more expansive voluntary recall of all of Iams' products that were manufactured by Menu Foods at any time. Id.[7]

---

[6] In fact, Iams' insistence that customers must come first led to the Menu Foods recall. As Paul Henderson, the Chief Executive Officer of Menu Foods, testified before Congress, Iams contacted Menu Foods about reports of several issues associated with one of its products on March 13, 2007. Menu Foods shared additional information with Iams on March 14, 2007. That evening, after reviewing Menu Foods' information, Iams notified Menu Foods that Iams intended to recall Iams' pet food manufactured by Menu Foods. As Mr. Henderson explained to Congress, it was Iams' persistence and insistence that led to the Menu Foods recall -- a persistence driven by Iams' desire to protect the interest of its customers.

[7] Iams sells both dry and wet dog and cat food. Id. ¶ 7. All of Iams' dry dog and cat food is manufactured at facilities that are owned and operated by Iams. Id. Iams' wet dog and cat food is manufactured by Menu Foods as a contract manufacturer. Id. While Iams provides Menu Foods with the specifications and formulas for all of its products (which are highly proprietary and different from any other products available for sale in the marketplace), Menu Foods manufactures the products for Iams at its Kansas and South Dakota facilities. Id.

Almost immediately after the recall was announced, Iams began receiving telephone calls from customers with questions about the safety of Iams and Eukanuba brand products. Hissong Decl., ¶ 10. Iams' Customer Service Line also experienced a dramatic increase in the number of requests for reimbursements in accordance with Iams' money back guarantee. Id. In addition, Iams began to receive requests for reimbursements of veterinary expenses associated with treatments for conditions allegedly connected with Iams or Eukanuba brand products (that were subject to the recall). Id. Iams reimbursed those customers for any products that were subject to the recall, in accordance with its product guarantee. Id. ¶ 13.

Iams is and has been reimbursing customers for, among other things, veterinarian expenses associated with Iams or Eukanuba brand products subject to the recall. Hissong Decl., ¶ 14.[8] Iams will also pay for (or reimburse customers for) wellness checkups (i.e., precautionary veterinarian visits) to alleviate concerns that customers may have after feeding Iams or Eukanuba recalled products to their pets. Id. While the amount -- in both numbers and dollars -- of its customer reimbursements have dramatically increased, Iams does not seek releases of any kind from the vast majority of customers seeking reimbursement. Id. ¶ 20. Iams seeks releases only from those customers who are provided reimbursements in excess of $1,000, or in the relatively small number of cases where the customer is provided reimbursement for amounts in addition to

---

[8] While there has been no conclusive determination about the source of the issue with the recalled products, reports indicate that the products were contaminated with melamine, which has been connected to an increase incidence of acute renal failure with cats and dogs that consume the products.

veterinary bills.[9] Id. In the vast majority of cases, Iams simply reimburses its customers without requesting a release. Id.[10]

C.      Resources Were Added to Respond to Customers' Calls About
        Reimbursement of Expenses

On March 29, 2007, Iams retained REM to assist in responding more quickly to the increased volume of customer calls it was receiving. Hissong Decl., ¶ 16. REM has significant experience with consumer relations, and was able to assist Iams on an expedited basis in managing and returning the large number of customer calls resulting from the recall. Id. While all of the customer calls continue to be answered initially by an Iams Specialist, Iams utilizes REM to return some of the calls. Id. ¶ 17. Iams Specialists and REM Representatives continue to respond to customer concerns and questions about Iams products. Id. ¶ 19. Iams and REM also continue to assist customers with reimbursement for product purchases, veterinarian expenses and other related expenses. Id.

Iams developed a specific training program to assist Specialists and Representatives with answering customer questions about the recall. Hissong Decl., ¶ 18. For example, with the customer's permission, Specialists or Representatives will contact the customer's veterinarian to ensure that the customer's pet receives proper treatment -- without delay -- regardless of the customer's ability to pay. Id. In many cases, the customers' pets have ongoing medical issues that require Iams' immediate financial assistance. Id. ¶ 12. Those

---

[9] These relatively few cases primarily include reimbursement for a deceased pet.

[10] With a copy of the release, Iams provides a letter to the customer that notifies the customer of the existence of the class action lawsuits. Variations of the letter are attached as Exhibits 1, 2 and 4 to the Hissong Decl. (attached as Exhibit A).

animals may not receive proper medical treatment without Iams' assistance in reimbursing veterinarian bills. Id.

> D.    As Iams Became Aware of Certain Issues, Iams Revised
>        Its Processes and Procedures

Since the recall was announced in mid-March, Iams has reassessed its reimbursement program to ensure that its policies and procedures satisfy the needs of its customers while complying with the legal obligations attendant to this litigation. The reimbursement program -- and its policies and procedures -- have been continually evaluated and revised as necessary. As stated, the Customer Service Line through which Iams communicates with its customers preceded this litigation by over a quarter-century; as lawsuits were filed, Iams adapted the policies and procedures governing the Service Line to ensure that its representatives were not communicating with represented parties.

On May 10, 2007, Iams' Legal Department was notified by an attorney in one of the Class Actions that an Iams or REM Representative returned the telephone call of an unnamed person that had filed a class action against Menu Foods. Hissong Decl., ¶ 25.[11] Iams investigated the situation immediately and revised its policies and procedures to ensure that such a situation did not occur again. Id. ¶ 26. Specifically, Iams circulated a list of all of the named Plaintiffs who had filed a lawsuit against Menu Foods (or Iams/P&G or any other Defendant) and instructed its Customer Service Department and REM not to return telephone calls from

---

[11] The contact came with a Plaintiff who has not sued Iams or P&G. Migliore v. Menu Foods, Case No. 07-CV-0575-RSL (W.D. Wash.). As indicated in counsel's response (DePalma Aff., Plaintiff's Exhibit B), Iams stated that it would not contact any named Plaintiff in any action, and it has made the effort to identify all of the named Plaintiffs in the 110 Class Actions in order to do so.

those customers. <u>Id</u>. The list thus includes many Plaintiffs who have not sued Iams or P&G. <u>Id</u>. Additionally, to ensure that the list remains current, Iams' Legal Department sends e-mails notifying the Customer Service Department and REM of any new named Plaintiffs as soon as it learns of the existence of a new lawsuit. <u>Id</u>.

In addition, to confirm that REM is following Iams' revised policies and procedures, Iams' Legal Department sent an attorney to REM's Atlanta, Georgia office on May 15, to audit and evaluate the procedures instituted by REM and to confirm that REM was not contacting named Plaintiffs or represented parties. Hissong Decl., ¶ 25.[12] As of May 24, all Iams Specialists and REM Representatives were also required to ask all customers who contact the Customer Service Line whether they are represented by counsel or part of a class action. <u>Id</u>. ¶ 27. Specialists and Representatives are required to ask that question immediately upon answering a telephone call from, or returning a telephone call to, any customer. <u>Id</u>. If the answer is in the affirmative, all communications with that customer are terminated.

E.    <u>Iams' Procedures Prevent Contact with Represented Parties</u>

Plaintiffs have submitted three Affidavits in support of their claim that Iams is deliberately contacting represented parties. The circumstances surrounding Iams communications with all three Affiants establishes that Plaintiffs claims in this regard are erroneous.

---

[12] Significantly, Iams' effort to limit contacts with named Plaintiffs occurred independently of this Court's activity in the <u>Workman</u> case. Iams is not a defendant in that case and did not become aware of this Court's hearings until the week of May 21, 2007.

1.    <u>Kerri Hamilton</u>: Ms. Hamilton admits that "once I advised them [Iams] that I had retained counsel, my communications with them stopped." K. Hamilton Decl., ¶ 10. Iams' communications with Kerri Hamilton are explained in the Declarations of Amy Dicke (attached as Exhibit B) and Lynn McCahren ("McCahren Decl."), ¶¶ 24-30 (attached as Exhibit C). Ms. Hamilton's testimony is evidence that Iams' protocols work -- communications were discontinued when she advised Iams that she retained counsel.

2.    <u>Todd Sokolowski</u>: Plaintiff's counsel misspelled Plaintiff's name as "Sokolwski" on the caption of the Class Action Complaint. McCahren Decl., ¶ 17. As a result of that misspelling, REM sent a letter to Mr. Sokolowski not knowing that he had retained counsel or filed a Complaint. <u>Id</u>. REM would not have sent a letter to Mr. Sokolowski if his name had been spelled correctly by his counsel. Importantly, if Mr. Sokolowski called REM, the first question REM would have asked is whether he was represented or part of class action; upon learning that he was, the communication would have terminated, as was the case with Kerri Hamilton. <u>Id</u>. ¶ 18.[13]

3.    <u>Carol Chiappetta</u>: On June 1, 2007, REM called Ms. Chiappetta to follow up on prior communications. McCahren Decl., ¶ 22. Ms. Chiappetta stated that "she will join the class action." <u>Id</u>. REM understood that to mean that she was not yet represented by counsel, and told her that it would call her at a later date to determine whether she had decided to join the

---

[13] Finally, it is worth noting that Plaintiff significantly misrepresents Iams' communications with Mr. Sokolowski. Plaintiff repeatedly represents to the Court that REM informed Mr. Sokolowski that he "must contact [REM]." <u>E.g.</u>, Plaintiff's Memorandum, pp. 4, 8, 13. REM's letter states that Mr. Sokolowski "may" contact REM, and that "If you have decided that you do not wish to pursue this claim, please call us . . . and let us know." Affidavit of T. Sokolowski, Exhibit A. Plaintiff's claim that REM told Mr. Sokolowski that he "must contact [REM]" is simply false.

class action. <u>Id</u>. On June 4, 2007, REM called back as promised, and Ms. Chiappetta stated that she had retained an attorney. <u>Id</u>. ¶ 23. At that point, REM ceased all communications with her. <u>Id</u>.[14]

The evidence establishes that, following the recall, Iams developed reasonable and appropriate protocols which prevent communications with named Plaintiffs and represented parties. Even in its worst light, the number of customer contacts (210,000) and the number of allegedly improper contacts (3) establish that Iams is not deliberately communicating with named Plaintiffs or represented parties.

Further, upon receiving Plaintiff's recent Emergency Motion, Iams again reassessed its policies and procedure and directed Marti Hissong and Lynn McCahren (the Iams and REM Supervisors responsible for the customer service operations) to institute additional procedures to ensure that represented parties are not contacted. Hissong Decl., ¶ 28; McCahren Decl., ¶ 32. Specifically, Iams instructed Hissong and McCahren to meet immediately with all customer service representatives and discuss the existing policies and answer questions about them. <u>Id</u>. Iams also instructed Ms. Hissong and Ms. McCahren to implement periodic monitoring of telephone calls of customer service representatives to ensure that Iams' policies and procedures are being followed. <u>Id</u>. Finally, Iams instructed Ms. Hissong and Ms. McCahren

---

[14] Iams has sent the copies of the complete files that it has for Mr. Sokolowski and Ms. Chiappetta to their attorneys. A copy of the June 22, 2007 letter to counsel is attached as Exhibit D. Iams does not know the identity of Ms. Hamilton's attorney, but will send a copy of her file to that attorney upon being notified of his or her identity. In addition, other named Plaintiffs have contacted Iams' Customer Service Line. Iams will send a copy of all of its communications with those named Plaintiffs to their counsel. Iams is not aware of any contact with a named Plaintiff after it instituted its no-contact policies on May 15, 2007 (except for Mr. Sokolowski, as described in the text).

to circulate a memorandum to all customer service representatives that re-emphasizes the importance of Iams' procedures and that explains those procedures again. Id. The instructions given by Iams were followed. Id.

        F.      Iams Has Informed Customers Signing Releases of the Pendency of the Class Actions

      Plaintiffs also claim (e.g., "Procter & Gamble could have provided information on pending litigation . . . yet [it] provided no such information") that Iams has failed to inform customers that sign releases that Class Actions are pending. Plaintiff's Memorandum, pp. 11-12. That is not accurate.

      As discussed above, Iams has obtained releases only from those customers who were reimbursed in excess of $1,000, or who received payment for other types of reimbursements (like reimbursement for the loss of a pet). Hissong Decl., ¶ 20. As of May 24, Iams provides a letter with each release, which notifies the customer (among other things) that Class Actions are pending, that the customer may be eligible to participate in those Actions, that the customer should seek the advice of counsel, and that the customer's options include: signing the release, contacting counsel about the pending Actions or doing nothing. Id. ¶ 21. Although Iams did not initially provide such a letter when forwarding a release to customers (who were reimbursed in excess of $1,000),[15] Iams subsequently sent every customer who received a release before June 13, a letter containing the same information. That letter, which is attached as Exhibit 4 to the Hissong Decl. (attached as Exhibit A), expressly offers those customers the option of

---

[15] E.g., Affidavit of K. Hamilton, Exhibit A. Ms. Hamilton would not have received a copy of Hissong Decl., Ex. 4, because she engaged counsel after Iams sent her the first version of the release.

rescinding the release and settlement agreement that they signed with Iams. Id., Exhibit 1.

Accordingly, Plaintiffs cannot point to a single named plaintiff, represented party or putative

class member who has been deprived of any rights in connection with this reimbursement

program associated with the recall.

III.        THERE IS NO EVIDENCE THAT IAMS HAS ACTED IMPROPERLY

This Court's authority under Rule 23 of the Federal Rules of Civil Procedure to

supervise communications with class members and putative class members is limited and must

balance the possible harm of such communications with the rights of the parties. Gulf Oil v.

Bernard, 452 U.S. 89, 101-02, 101 S. Ct. 2193, 2201 (1981). The Third Circuit requires actual

evidence that a defendant has acted improperly and sought to undermine the lawsuit before

entering an order restricting communications. In re Sch. Asbestos Litig., 842 F.2d 671, 680 (3d

Cir. 1988); Jenifer v. Delaware Solid Waste Auth., Nos. 98-270/98-565 MMS, 1999 U.S. Dist.

LEXIS 2542, at *10 (D. Del. Feb 25, 1999). Any administration by the Court must be narrowly

tailored to avoid impinging on Iams' constitutional rights and survive First Amendment scrutiny.

Any infringement of such rights must be strictly limited to that which is determined necessary

after sufficient findings have been established in the record. Gulf Oil, 452 U.S. at 102.

In Gulf Oil, the seminal case on this issue, the Supreme Court held:

"[A]n Order limiting communications between parties and
potential class members should be based on a clear record and
specific findings that reflect a weighing of the need for a limitation
and the potential interference with the rights of the parties. Only
such a determination can ensure that the court is furthering, rather
than hindering, the policies embodied in the Federal Rules of Civil
Procedure, especially Rule 23. In addition, such a weighing --
identifying the potential abuses being addressed -- should result in
a carefully drawn order that limits speech as little as possible,
consistent with the rights of the parties under the circumstances."

14

Id. at 101-02 (emphasis added).

    A.    <u>There Is No Evidence of Abusive Conduct</u>

    To limit pre-class certification communication with putative class members, a plaintiff must present "a specific record [of evidence] of the particular abuses by which it is threatened." <u>Gulf Oil</u>, 452 U.S. at 102. "[T]he mere possibility of abuses does not justify routine adoption of a communications ban that interferes with the formation of a class or the prosecution of a class action." <u>Id</u>. at 104. For example, in <u>Gulf Oil</u>, a class action was filed charging racial discrimination in employment. Pursuant to a compromise with the Equal Employment Opportunity Commission ("EEOC"), the company sent a notice to employees who were eligible for back pay and offered an amount in exchange for release of liability. <u>Id</u>. at 91. After the company's agreement with the EEOC, a class action was brought on behalf of African-American employees in federal court and many of the class members were among those receiving offers of settlement from Gulf. <u>Id</u>. at 92. The district court issued an order banning communication by the parties or their counsel with potential class members. <u>Id</u>. The Court of Appeals, <u>en banc</u>, vacated the order as violative of the First Amendment, finding the communication ban to be an unconstitutional prior restriction on protected expression, as well as an inappropriate order under Rule 23(d). <u>Bernard v. Gulf Oil Co.</u>, 619 F.2d 459, 464 (5th Cir. 1980), <u>aff'd</u>, 452 U.S. 89, 101 S. Ct. 2193 (1981).

    Two kinds of proof are required to show actual or threatened abuse in order to restrict communications. First, the movant must show that a particular form of communication has occurred or there is a threat that it will occur. Second, the movant must show that the particular form of communication at issue is abusive and threatens the proper functioning of the litigation. <u>Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.</u>, 214 F.R.D. 696, 697-98 (S.D. Ala.

2003). Abusive practices that have been considered sufficient to restrict communication include:

(1) communications that coerce prospective class members into excluding themselves from the

litigation;[16] (2) communications that contain false or misleading statements;[17] and

(3) communications that undermine cooperation with or confidence in class counsel.[18]

        Plaintiff fails to offer proof sufficient to warrant restricting Iams' communication

with its customers. The Supreme Court's decision in Gulf Oil is clear -- a court must be

presented with a specific record of evidence by the moving party of the particular abuses by

which it is threatened. Gulf Oil, 452 U.S. at 102. "[T]he mere possibility of abuses does not

---

[16] E.g., Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., 206 F. Supp. 2d 559, 562 (S.D.N.Y. 2002) (defendants were required to comply with the court's mandated communication restrictions where their communication scared potential class members from joining the class), aff'd, 2002 U.S. Dist. LEXIS 11877 (S.D.N.Y. July 1, 2002).

[17] E.g., In re School Asbestos Litig., 842 F.2d 671, 683 (3d Cir. 1988) (holding that an order under Rule 23(d) requiring defendants' affiliate to prominently display a prescribed notice when it communicated directly with members of the potential class was within the court's discretion where defendants distributed misleading booklets that may have convinced members of the plaintiff class to forego asbestos removal in their buildings); Impervious Paint Indus., Inc. v. Ashland Oil, 508 F. Supp. 720, 723 (W.D. Ky. 1981) (restricting defendant's communication with potential class members where defendant advised class members that evidentiary proof of claim would be required for recovery and that class members might be subjected to discovery and other legal procedures).

[18] E.g., Kleiner v. First Nat'l Bank, 751 F.2d 1193, 1206 (11th Cir. 1985) (granting protective order where defendant conducted covert telephone campaign with the explicit purpose of soliciting opt-outs from potential class members); Hampton Hardware, Inc. v. Cotter & Co., 156 F.R.D. 630, 632 (N.D. Tex 1994) (prohibiting defendants from contacting potential class members following the issuance of three letters to potential class members that asserted that the named Plaintiff was "asking you to sue yourself" and urging potential class members to release claims or opt-out of the class); Haffer v. Temple Univ. of Commonwealth Sys. of Higher Educ., 115 F.R.D. 506, 512 (E.D. Pa. 1987) (prohibiting defendants in a certified class action from speaking with class members where defendants expressly discouraged class members from meeting with plaintiffs' counsel); Tedesco v. Mishkin, 629 F. Supp. 1474, 1476 (S.D.N.Y. 1986) (restraining defendant from communicating with class members where defendant sent unauthorized, false, misleading and inherently coercive letter written by defendant but signed by a class member to class plaintiffs, attacking class counsel and discouraging participation in the class action).

justify routine adoption of a communications ban that interferes with the formation of a class or

the prosecution of a class action in accordance with the Rules." Id. at 104 (emphasis added).

Contrary to the facts in all of the cases where courts have restricted defendants' communication,

Iams' communications with putative class members are not intimidating, coercive, oppressive or

misleading. Indeed, unlike any of the cases where courts have restricted communication in the

past, Iams has never initiated any direct communication with putative class members; all of Iams

direct contact with putative class members has been exclusively in response to inquiries from

putative class members that desire information or assistance with respect to Iams products.

Hissong Decl., ¶ 24.

Plaintiffs also cite several cases for the proposition that courts have "broad

authority to regulate communications between Defendants and putative class members" pursuant

to Federal Rule of Civil Procedure 23(d). Plaintiff's Memorandum, pp. 9-10. These cases,

however, deal with orders entered after certification of a class. E.g., Kleiner v. First Nat'l Bank,

751 F.2d 1193, 1207 (11th Cir. 1985), Erhardt v. Prudential Group, Inc., 629 F.2d 843, 845 (2d

Cir. 1980); In re School Asbestos Litig., 842 F.2d at 683. Prior to class certification, "no

attorney-client relationship exists between class counsel and the putative class members" thus,

the ethical rules do not preclude attorneys or their agents from communicating with such

members. Hammond v. Junction City, 167 F. Supp. 2d 1271, 1286 (D. Kan. 2001); In re

McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1239, 1245 (N.D. Cal. 2000). Furthermore,

the cases cited by Plaintiffs involve a defendant's overt attempt to mislead or influence the class

members. E.g., Jenifer, 1999 U.S. Dist. LEXIS 2542, at *10; In re School Asbestos Litig., 842

F.2d at 683. Courts have consistently held that there is no prohibition against communication,

negotiation or settlement with putative class members.

17

B.    Prohibiting Iams From Communicating with Putative Class Members
       Violates the First Amendment

The U.S. Supreme Court has invalidated court orders that place a blanket ban on a

party's communication with potential class members prior to class certification about the

substance of the class action. Gulf Oil, 452 U.S. at 101. Any court order that limits

communication between a party and potential class members must be based on "a clear record

and specific findings that reflect a weighing of the need for a limitation and the potential

interference with the rights of the parties." Id. In Kleiner, 751 F.2d at 1205, the court held that

"an order limiting communications regarding ongoing litigation between a class and class

opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a

'heightened sensitivity' for first amendment concerns."

Iams has not engaged in any instances of targeted letters or announcements

designed to coerce, threaten or intimidate potential class members. Payne v. Goodyear Tire &

Rubber, 207 F.R.D. 16, 21 (D. Mass. 2002) (denying plaintiffs motion to limit defendant's

ex parte communications where the record contained no evidence that defendant was either

pressuring plaintiffs to opt out of the litigation or preventing them from participating in the

litigation); Burrell v. Crown Cent. Petroleum, Inc., 176 F.R.D. 239, 241-45 (E.D. Tex. 1997)

(denying motion to limit communications where defendant's contacts with potential class

members though e-mail and employee meetings advising potential class members of the pending

lawsuit were not inherently coercive or made to intimidate employees from joining the suit);

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.24, at 232-33 (1995) ("the Court should not

restrict communications between the parties or their counsel and actual or potential class

members, except when justified to prevent serious misconduct").

Moreover, each of the cases cited above involve situations where defendants initiated communication with potential class members, unlike this case, where the putative class members have initiated all contact with Iams. Iams has responded to putative class members only after their initial communication. Hissong Decl., ¶ 24. Iams has not initiated any telemarketing or recorded messages. Id. ¶ 29.

In Lee v. Am. Airlines, Inc., No. 3:01-CV-1179-P, 2002 U.S. Dist. LEXIS 2232, (N.D. Tex. Feb. 12, 2002), plaintiff moved for court supervision of defendant airline's contacts with class members pursuant to Fed. R. Civ. P. 23(d). Id. at *3. Absent class members contacted defendant with respect to complaints about lengthy delays in airline departures and poor airline service, the subject matter of the case. Defendant offered these individuals non-monetary compensation in the form of travel vouchers. Passengers acceptance of such vouchers released all of the passengers' future claims for additional compensation from American Airlines. Id. at *5.

The Northern District of Texas held that plaintiff failed to allege or prove that defendant engaged in any abusive or unethical communications with potential class members. Specifically noting that the fact that "potential class members may be contacting American with respect to the subject matter in the case constitute an inadequate basis for imposing such sweeping pre-certification communication restrictions." Id. at *6-7. E.g., Gates v. Cook, 234 F.3d 221, 227 (5th Cir. 2000) (vacating order prohibiting contact with class members regarding anything within the subject matter of the class action -- i.e., prison conditions, treatment, and healthcare of HIV inmates -- as not narrowly drawn nor justified by sufficient factual findings). The Court also found that plaintiff "failed to allege or prove any instances of targeted letters or announcements designed to threaten or intimidate potential class members if they were to join

19

the litigation," as required pursuant to Fed. R. Civ. P. 23. Lee, 2002 U.S. Dist. LEXIS 2232, at *7.

No court has ever prohibited a defendant from communicating with a putative class member when that putative class member initiated the exchange. The entire body of caselaw that discusses improper communications deals only with communication initiated by defendants and targeted at putative class members. Iams is not initiating or targeting, and Iams should not be restricted from responding to putative class members' inquires.

C.    Iams Has a Right to Interact with Its Customers

An effort to maintain Iams' goodwill and relationships with its customers cannot be held hostage by the filing of a putative class lawsuit. Courts are deferential to the rights of businesses and their customers to communicate. "In the absence of a local court rule or a pretrial order prohibiting or restricting communications by the defendants with absent class members, the defendants may continue to communicate in the ordinary course of business with members of the class, as long as they do not infringe on . . . the attorney client relationship." 5 NEWBERG ON CLASS ACTIONS § 15:14, at 55-56 (2002).[19]

In Rankin v. Bd. of Educ. of the Wichita Pub. Schs., 174 F.R.D. 695 (D. Kan. 1997), plaintiffs sought certification of a class of students identified as speech-language impaired, and requested an order prohibiting the defendant school entity from communicating with them. Id. at 697. The court denied plaintiffs' request, holding that an exception exists

---

[19] Accord: Id. ("In corporate and securities class action litigation, the defendants may communicate with shareholders concerning the pendency of the class action as a matter of course, in conjunction with the issuance of annual and quarterly reports to stockholders.").

"when [communication is] necessary for the maintenance of services which are presently being provided to the plaintiffs . . . . It would be very difficult, if not impossible, for defendants to continue to provide services [to the students] if all communications had to be made through counsel." Id. The court found that defendant's letter to putative class members requesting that they contact defendant for compensatory speech-language classes was not an abusive communication, even though it made no reference to the pending litigation, because the "communication [was] made in the ordinary course of providing educational services." Id. Accord: Lee, 2002 U.S. Dist. LEXIS 2232, at * 5-6 (permitting defendant to communicate with its customers, who were also putative class members, to provide airline vouchers in order to remedy issues with delayed and cancelled flights).

Similarly, Iams response to customer inquiries is necessary in order to carry on its ordinary business of providing quality pet food and complying with its money back guarantee. Where the defendant school in Rankin was permitted to communicate with parents as part of its ordinary business, Iams must likewise be permitted to communicate with its customers about the health and well-being of their pets. Iams has built an enormous asset in customer goodwill as a result of its customer service, by, for example, providing a 100% money back guarantee on all of its products. A third party may not, by filing a putative class action, insert himself between a company and its customers, by preventing them from interacting in their ongoing business relationships.

Also compelling is the fact that many of the individuals who call Iams' Customer Service Line have pets with ongoing health problems. It would be contrary to public policy to restrict a seller, like Iams, from taking the affirmative steps to correct defective products and ensure the safety of its customers. Cox, 214 F.R.D. at 699 (permitting defendant to communicate

21

with putative class members to remedy defective product). The courts should not chill conduct that is remedial in nature. Id. Iams reimbursement process provides a means to expeditiously reimburse consumers for veterinary bills so that customers have the available funds to continue further treatment. Precluding Iams from communicating with these individuals may adversely affect the health of their animals.

IV.    IAMS HAS NOT ENGAGED IN IMPROPER COMMUNICATION WITH PUTATIVE CLASS MEMBERS AND A PROTECTIVE ORDER IS NOT WARRANTED

Pursuant to Fed. R. Civ. P. 23, Iams may communicate with putative class members as long as the communication is not coercive or misleading. "[D]efendants ordinarily are not precluded from communications with putative class members, including discussions of settlement offers with individual class members before certification, but may not give false or misleading information, or attempt to influence class members in making their decision whether to remain in the class." MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.24, at 233 (1995).

A.    Settlement Is Encouraged and Does Not Constitute Coercive Communication

A defendant has the right to communicate settlement offers directly to putative class members. In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 137 (2d Cir. 1998) (in general, a party in class action litigation may attempt to settle with individual putative class members); Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc., 455 F.2d 770, 773 (2d Cir. 1972) (permitting communication with putative class members even where defendant succeeded in settling with so many putative class members that the court was forced to deny class action status); Bublitz v. E.I. DuPont de Nemours & Co., 196 F.R.D. 545, 548 (S.D. Iowa 2000) (before a class action is certified, it will ordinarily not be deemed inappropriate for a

defendant to seek to settle individual claims); Cada v. Costa Line, Inc., 93 F.R.D. 95, 97 (N.D.

Ill. 1981) (permitting defendants to individually contact potential class members regarding

settlement, but requiring that the settlement letter disclose that they could await the

developments in the proposed class action if they so chose).[20]

Indeed, at the May 23, 2007 hearing in the Workman matter, this Court stated:

> "I made it clear last time, and I'll make it clear now, I will do
> nothing to interfere with your client's right to settle cases.  The
> case law is absolutely clear, you have a right to communicate with
> people who are willing to do it."

May 23, 2007 Trans., p. 33 (Case No. 07-1338) (excerpt attached as Exhibit E).  Accord:

May 18, 2007 Trans., p. 51 (Case No. 07-1338) (this Court stated:  "I understand and read the

cases, and of course will follow those that make clear you have a right to communicate with

those who desire to settle") (excerpt attached as Exhibit F).

Settlements are looked upon favorably by the courts, particularly in complex class

actions in which the court's resources may be heavily taxed by prolonged litigation.  Icicle

Seafoods, Inc. v. Baker (In re The Exxon Valdez), 229 F.3d 790, 795 (9th Cir. 2000) ("the

general policy of federal courts to promote settlement before trial is even stronger in the context

of large-scale class actions").[21]  The Seventh Circuit has articulated a three-pronged standard for

---

[20] Payne v. Goodyear Tire & Rubber Co., 207 F.R.D. 16, 20 (D. Mass 2002) (defendants were
permitted to create and publish websites that contained information about the class action).

[21] Accord:  McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 295, 299, n.11 (D. Mass. 2004)
(denying motion precluding ex parte interviews with putative class members and stating in
relevant part, that if "during the course of frank and non-coercive interviews, the employer and
employee resolve their potential disputes, all the better.  One can hardly gainsay the notion that
there is nothing inherently wrong - and, indeed, it is inherently better - that putative litigants
resolve their beefs and disputes short of full-scale litigation and all that litigation entails.  Apart
(footnote cont'd...)

evaluating whether providing settlement options to individual class members is appropriate: "[a]n offer to settle [made to individual class members] should contain sufficient information to enable a class member to determine (1) whether to accept the offer to settle, (2) the effects of settling, and (3) the available avenues for pursuing his claim if he does not settle." In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1139 (7th Cir.), cert. denied, 444 U.S. 870, 100 S. Ct. 146 (1979).

Iams' claims reimbursement letters ("Letters") and releases notify consumers of the required information. The Letters are attached as Exhibits 1, 2, and 4 to the Hissong Decl. (attached as Exhibit A). The Letters specifically note that "class action lawsuits have been filed throughout the United States and Canada by a number of attorneys who each seek to represent the interests of pet owners, like yourself . . . Any reimbursement provided by P&G Pet Care would require you to sign the release form that would release claims for any injury that may have arisen out of the recall. You do have the option of contacting one of the Plaintiff's attorneys who have filed class actions . . . ." Id. The release expressly states that the consumer releases Iams "from any and all claims . . . that arose out of, or relate to any claim suffered from the purchase and feeding of any product that was subject to the Menu Foods recall." Id., Exhibit 2. Accordingly, the communications meet the three prong standard articulated in General Motors.

_____

(...cont'd)
from the fact that the coffers of class action counsel receives less than expected, a de minimum matter in this court's view, informal resolution of such disputes is a win-win proposition.").

B.    Iams' Claim Reimbursement Process Seeks to Make Customers
      Whole and Therefore Cannot Be Coercive

To the extent that the complaint seeks to restore consumers' benefit of the bargain,

Iams communications cannot be restricted.  For example, in <u>Cox Nuclear Med. v. Gold Cup</u>

<u>Coffee Servs.</u>, 214 F.R.D. 696, 699 (S.D. Ala. 2003), defendant Maxwell sent a letter to all

customers who purchased a bag labeled as containing 42 packs of Maxwell House Master Blend

coffee, explaining that the box accidentally contained only 35 packs.  Maxwell also enclosed a

check which the defendant believed to be the value of the difference.  The letter and check

reflected that cashing or other endorsement of the check would release the defendant from

further liability.  <u>Id</u>. at 698.  Plaintiff argued that the letter was a fraudulent attempt to terminate

the proceedings without full compensation and therefore interfered with the proposed class

members ability to remain as part of the class without advising them that a class action lawsuit

was filed on their behalf.  The court held that "[t]he failure to recognize the existence of a

putative class action, however, could be abusive only if the class action sought recovery in

excess of that proposed by the defendant, because only then could the class action vehicle offer

the possibility of a more favorable result than the proposed settlement." <u>Id</u>. at 699.

Iams' claims reimbursement process is not coercive, but is aimed at expeditiously

reimbursing consumers for the damage they may have suffered as a result of the pet food recall.

Upon proof of claim, Iams reimburses expenses (<u>i.e.</u>, veterinarian bills and recalled products),

including potential future veterinary expenses.  Hissong Decl., ¶ 13.  Moreover, Iams does not

even require putative class members to sign a release for claims under $1,000.  <u>Id</u>. ¶ 20.  These

facts are persuasive in negating any claim of coercive communication.

Plaintiff argues that Iams' communications with Ms. Hamilton were coercive because the offer was provided as "take it or leave it."  Plaintiff's Memorandum, p. 13; Hamilton Decl., Exhibit C, ¶ 10.  Ms. Hamilton filed a Better Business Bureau complaint against Procter & Gamble that required the parties to negotiate.  McCahren Decl. ¶ 25, Exhibit 2.  Ms. Hamilton pursued that negotiation until Iams refused to pay an exorbitant price for a Yorkie.  Id. ¶ 26.  She then contacted an attorney, and Iams has since declined to speak with her directly.  Id. ¶ 28.

Mr. Sokolowski contends that he was under the impression that he "must contact [REM]."  Plaintiff's Memorandum, p. 13.  Mr. Sokolowski, however, was never required or coerced to talk with REM, and only received a letter from REM because his name was misspelled on the Complaint.  Id. ¶¶ 17-18.  REM's letter states:  "If you have decided that you do not wish to pursue this claim, please call us at the toll free number and let us know."  Sokolowski Decl., Exhibit A.

C.    The Conditions that Led to the Consent Order Before This Court Do Not Exist with Iams' Reimbursement Program

The Consent Order agreed to between Defendant Menu Foods, Inc. and Plaintiff, Jamie Workman, in this Court does not apply to Iams, nor would any such order be necessary as Iams' reimbursement program is much different than Menu Foods' reimbursement program.  Moreover, none of the issues afflicting Menu Foods' reimbursement program are present in Iams' reimbursement program.  As a result, there simply is no reason to issue an order that would unjustifiably prevent Iams from continuing to communicate with its customers.[22]

---

[22] The fact that the communications are occurring between Iams and its customers is a key distinction here.  Iams has an ongoing relationship with these customers who rely upon Iams to help them with issues related to their pets.  The trust between Iams and its customers is essential

(footnote cont'd...)

26

1.      <u>Iams is Not Contacting Represented Parties or Named Plaintiffs</u>

One of the major concerns expressed by this Court regarding the program instituted by Menu Foods-- in fact, the key concern -- was that Menu Foods seemed to have no precautions in place to prevent communications between its representatives and represented parties. Such conditions do <u>not</u> exist at Iams as Iams has reasonable and appropriate protocols in place to prevent any communications with named Plaintiffs or represented parties.

Iams' Customer Service Department and its Representatives at REM have been specifically instructed <u>not</u> to return the telephone calls of any customer who has filed a class action against Menu Foods. Hissong Decl., ¶ 26; McCahren Decl., ¶ 11. Iams Customer Service and REM have a continually updated list of named Plaintiffs to ensure that no person who is listed is contacted by Iams or REM. <u>Id</u>. Contrary to the deficiencies that plagued Menu Foods' program, Iams has instituted reasonable and appropriate safeguards to prevent communications with represented parties.

2.      <u>Iams Does Not Require Customers to Fill Out Any Data Collection Forms</u>

One of the concerns expressed by Plaintiff's counsel in the <u>Workman</u> case was that Menu Foods was using a data collection form to obtain detailed information about the putative class members. May 18, 2007 Trans., pp. 10-14, (Case No. 07-1338) (excerpt attached

---

(...cont'd)
to Iams because it represents substantial and valuable goodwill that Iams has built with its customers over many, many years. Iams is deeply protective of that interest and it would not act in any way to harm its relationship with its customers through any sort of misleading or coercive communication. The damage from such communications to Iams' business would be far worse than any benefit achieved by resolving putative class members' claims. These putative class members are Iams' customers, and Iams is concerned about making sure that these customers remain Iams' customers and continue to trust Iams' dog and cat food products.

as Exhibit F). Unlike Menu Foods' reimbursement program, Iams does <u>not</u> require any putative

class members -- its customers -- to complete informational forms. Hissong Decl., ¶ 19. Iams

merely asks limited questions about medical bills, the health of the pet, and the pet's

consumption of food so that Iams can determine whether the customer is entitled to

reimbursement. <u>Id</u>. Iams is <u>not</u> collecting information from customers as part of an attempt to

obtain any informal discovery from absent or putative class members.

        3.     <u>Iams Does Not Require Most Customers to Sign Release Forms</u>

     Unlike Menu Foods' program, Iams does not require a release in the vast majority

of cases in which customers receive reimbursement. <u>Id</u>. ¶ 20. Only those customers who receive

reimbursements in excess of $1,000 or receive payment for other types of reimbursements (like

reimbursement of the loss of a pet) are required to sign a release as a condition of payment. <u>Id</u>.

Moreover, in those cases where a customer has signed a release, Iams: (1) provides a letter to

that customer fully explaining their options and instructing them that they should contact an

attorney if they have any questions; or (2) provides a letter advising the customer that they can

rescind their settlement and release at any time by returning the settlement funds. <u>Id</u>. ¶¶ 21, 22.

Plaintiffs cannot point to any instance in which a named party, represented party or putative class

member has been deprived of the right to participate in a Class Action if they desire.

V.        <u>PLAINTIFF'S REQUESTED REMEDY DRAMATICALLY EXCEEDS</u>
           <u>REMEDIES APPROPRIATE UNDER LAW</u>

     Even if the Court were to conclude that some form of intervention in Iams'

communications with its customers was warranted, Plaintiff's requested remedy -- that Iams be

precluded from communicating with putative class members (<u>i.e.</u>, Iams' customers) about the

recall -- is unlawful. The United States Supreme Court has held that any order limiting

communications with putative class members must be a "carefully drawn order that <u>limits speech as little as possible.</u>" <u>Gulf Oil</u>, 452 U.S. at 102.

Iams may have truthful, non-coercive communications with putative class members, and Iams may enter into settlement agreements with putative class members. Plaintiff's requested relief, which would entirely preclude Iams from communicating with putative class members about the recall, substantially exceeds what is lawful under <u>Gulf Oil</u>. Thus, under no circumstances should the Court issue an order that precludes Iams from communicating with or settling with putative class members.

VI.     <u>CONCLUSION</u>

Iams has reasonable and appropriate procedures in place to prevent communications with represented parties. Decisions by the United States Supreme Court and the Third Circuit establish that Iams' communications with putative class members cannot be restricted. Therefore, Plaintiff's motion should be denied.

Respectfully submitted,

OF COUNSEL:

| | |
|---|---|
| | s/ Francis McGill Hadden |
| D. Jeffrey Ireland (Ohio Bar No. 0010443) | Francis McGill Hadden (FH-4564) |
| Brian D. Wright (Ohio Bar No. 0075359) | Alan R. Gries (AG-8151) |
| FARUKI IRELAND & COX P.L.L. | Lauren V. Amjed (LA-7853) |
| 500 Courthouse Plaza, S.W. | GIBBONS P.C. |
| 10 North Ludlow St. | 1700 Two Logan Square |
| Dayton, OH 45402 | 18th & Arch Streets |
| Telephone: (937) 227-3710 | Philadelphia, PA 19103-2769 |
| Telecopier: (937) 227-3749 | Telephone: (215) 446-6275 |
| E-mail: djireland@ficlaw.com | Telecopier: (215) 446-6305 |
| | E-mail: fhadden@gibbonslaw.com |

Attorneys for Defendant
The Iams Company